# Richmond

CITY OF LYNCHBURG, ET AL. V. DOMINION THEATRES, INC.

February 26, 1940.

Record No. 2138.

Present, All the Justices.

36

The opinion states the case.

*T. G. Hobbs* and *Robert D. Morrison,* for the appellants.

*Samuel H. Williams,* for the appellee.

*Christian, Barton & Parker, amicus curiae.*

GREGORY, J., delivered the opinion of the court.

The Dominion Theatres, Inc., operators of moving picture theatres in the city of Lynchburg, secured from the owners a film known as "The Birth of a Baby" to be shown there. A permit had been issued by the Division of Motion Picture Censorship for the State of Virginia granting the right to exhibit the film. The city manager of Lynchburg with the approval of the city council notified the manager of the theatre corporation that the picture could not be publicly shown because it violated certain city ordinances which prohibited the showing of obscene and indecent pictures.

The theatre corporation filed a bill in the Corporation Court alleging that the film had been submitted to the

Division of Motion Picture Censorship, the members of which had personally examined the film, and the division, after the statutory test provided for in the Circuit Court of the city of Richmond, issued a permit for its public exhibition. An injunction was asked to restrain the city from interfering with the showing of the picture. A declaratory decree and other relief were also prayed for.

The city answered the bill and among other things averred that the city had the right under its charter to prohibit the exhibition of the picture if it were indecent and obscene regardless of whether it had passed the inspection of the Division of Motion Picture Censorship.

The theatre corporation moved to strike out the answer for the reason that a valid permit had been issued by the Division of Motion Picture Censorship of Virginia allowing the picture to be shown; that the State of Virginia by statute had occupied the entire field of motion picture censorship and that the city had no right to act under its charter provisions; that the powers asserted by the city were in conflict with those reserved to the State in the motion picture censorship statutes and were therefore void.

The court, after hearing argument and after painstaking consideration, attested by the able opinion filed in the case, entered an order striking out the answer and held that the theatre corporation had the right to exhibit the picture in Lynchburg. Other requests for relief prayed for in the bill of complaint were not passed upon by the court and while exception was taken to the failure of the court to grant those requests the exception has now been waived and is of no further importance.

The single question to be decided is whether the city of Lynchburg under its charter had the power to prohibit the exhibition of the film after it had been duly licensed and a permit issued therefor by the Division of Motion Picture Censorship of Virginia.

It may be assumed that under its charter the city once had the right to prohibit the public showing of a film deemed by the city to be contrary to good morals or indecent and

that the city possessed the right to censor films. But are these charter powers and ordinances enacted thereunder unaffected by the enactments of the General Assembly in 1922 and 1930 authorizing the regulation and control of motion and sound films and all matters connected therewith, and revising and codifying all the statutes relating to the censorship of motion pictures?

The pertinent statutes are now found in the 1930 Acts of Assembly, ch. 49, page 49. They need not be set out at large here. There can be no question of the power of the State of Virginia to censor moving picture films. The exercise of that power may be expressed through state statutes or it may be delegated to municipalities.

The State, acting through its General Assembly in 1922, began the exercise of its power of censorship, regulation, and control of moving picture films. (Acts 1922, ch. 257, page 434.) The title of the act is "An act to regulate motion picture films and reels; providing a system of examination, approval and regulation thereof, * * * creating the board of censors; and providing penalties for the violation of the act." It was made unlawful to exhibit any film without first obtaining from the board of censors a valid license or permit for the film.

In 1930 substantial amendments were made to the act of 1922. These amendments are embraced in ten new sections of the Code numbered 374a, 378a, 378b, 378c, 378d, 378e, 378f, 378g, 378h, and 378i. They relate, as expressed in the title, to the "Division of Motion Picture Censorship; providing for the regulation of motion and sound films * * * ; providing a system of examination, approval and regulation thereof, and of all matters connected therewith; providing for censors, their powers and duties; providing penalties for the violation of the sections embraced in this act, and to revise and codify the laws of this State relating to the censorship of motion and sound picture films * * * ."

At first the Division of Motion Picture Censorship refused the permit for the film in question but upon appeal

to the Circuit Court of the city of Richmond, in accordance with the express provisions of the statute, the court directed the division to issue the permit, which was accordingly done. Upon the final issuance of the permit the rights of all parties attached just as though the permit had been issued in the first instance and no court action had been taken. In other words, the rights of the theatre corporation are in no sense weakened by the fact that the permit was issued upon the order of the circuit court.

It is essential to ascertain the legislative intent. *Shaw* v. *City of Norfolk*, 167 Va. 346, 189 S. E. 335. Did the State intend by its enactments to monopolize the entire field of motion picture censorship and regulation or did it intend to share the power with the city of Lynchburg? If the legislature intended that the State alone should occupy the entire field of moving picture censorship and control, then it is perfectly apparent that the ordinances adopted under the authority of the city charter are in conflict with those statutes and void certainly to the extent of the claimed right of the city to censor films. On the other hand, if the legislature intended that the control of the State should not be exclusive but was to be exercised concurrently with the city of Lynchburg, then under the charter powers the city could censor films.

The learned trial judge, the Honorable Aubrey E. Strode, in speaking of the legislative intent, had this to say in his illuminating opinion:

"In *Shaw* v. *Norfolk*, 167 Va. 346 [189 S. E. 335], cited for the defendants, the Court quotes with approval from McQuillin,—'The true doctrine appears to be that, whether the city may exercise control of state offenses must be determined by the legislative intent. And such intent must also decide the manner in which the power is to be exercised, and whether such control is to be exclusive or whether it is to be exercised concurrently with that of the state.' The title of the latest (1930) enactment of the Act in issue is illuminative of the legislative intent: 'An Act providing for the regulation of motion and sound films, reels or rec-

ords used in connection with any motion picture; providing a system of examination, approval and regulation thereof and of all matters connected therewith,' etc.

"Applying 'the true doctrine,' quoted above, to the present case, and bearing in mind that after all, rules of construction are designed for the ascertainment of legislative intent and give way when that intent is manifest, it appears clear here from the title of the acts, the comprehensive language used, the evils to be remedied and the system chosen that it was intended to establish a uniform method of admeasurement of films in the respects indicated to apply throughout the State, and which when applied and met would in the judgment of the Legislature both best safeguard the people of the State against the exhibition of improper films and insure against prosecution the owners of the films who are taxed to pay for the inspections thus required and made.

"To these ends the statute is comprehensively framed. A competent Board is provided for. All films proposed to be exhibited publicly anywhere in the State are required to be first submitted, for inspection, to be viewed, and reviewed if necessary, by the Board.

"If a permit is declined, appeal may be taken, as was had for the film now in issue, to the Circuit Court of the city of Richmond, the trial court most generally charged by law with the determination of issues affecting State officers and of statewide import in that connection. That high court of record is given authority, after hearing evidence and argument, to review and reverse, as we have seen was done as to this film, the decision of the Board, and to require the issuance by the Division of the permit sought.

"It does not appear reasonable that after having thus provided for a decision by a high court of record it was in contemplation that that decision might in effect be made subject to review and reversal by any Justice of the Peace or Trial Magistrate under a city ordinance. This might result if the contention of the defendants be sustained in the instant case.

. "Thereby at least some of the apparent prime purposes of the Act would be brought to nought.

"The State by its statute having occupied the entire field of moving picture censorship, municipalities are thereby excluded therefrom as to matters comprehended by the statute."

The foregoing quotation taken from the opinion of the trial judge is convincing and conclusive. We adopt it as our own.

In 43 C. J., Municipal Corporations, section 219 (p. 215), is found a clear statement of the principle applicable to the present case. A municipal corporation being a creature of the State, existing under its sovereignty and possessing only such powers as are conferred by the State, "municipal regulations must not * * * contravene the general law, nor can such regulations be repugnant to the policy of the State as declared in general legislation. The power of the corporation to exercise its police power over a particular subject matter ceases when the State acts upon the same subject matter unless there is room for the exercise of concurrent jurisdiction." That same text (43 C. J., section 219) is authority for the principle that a State statute will override conflicting municipal ordinances and if ordinances assume to permit acts which the State prohibits, or prohibits acts permitted by the State statute, such ordinances are uniformly declared null and void.

.The foregoing principle has been applied in Virginia. This court has held that when a city ordinance conflicts with a State statute, the statute will prevail. *Carlton* v. *Boudar,* 118 Va. 521, 88 S. E. 174, 4 A. L. R. 1480. Again in *City of Roanoke* v. *Land,* 137 Va. 89, 119 S. E. 59, where there was a conflict between a State statute and a city ordinance regulating pawnbrokers, the court held that the statute controlled and the ordinance was void. The statute there covered the entire subject.

What the legislature permits the city cannot suppress without express authority therefor. It may be difficult in some cases to determine when a conflict exists between a

State statute and a city ordinance, but no such difficulty. appears in the case in judgment. Here the State pursuing a statewide policy has expressed an intention to occupy the entire field of legislation respecting the control and censorship of moving pictures. This intention is found in the very statutes themselves when considered as a whole. It may be assumed, as already indicated, that the charter powers of the city of Lynchburg were broad enough to authorize ordinances prohibiting the showing of obscene films, yet, when the general assembly passed its regulatory acts preempting the entire field of legislation touching the subject matter, the charter powers were no longer operative.

What films may be shown must be determined by the Division of Motion Picture Censorship. The statutes vest that power exclusively in the division and provide a uniform means for the inspection of films and the issuance of permits for their exhibition. There is no language in the statutes which authorizes the city of Lynchburg to share this jurisdiction. The exercise of the power by the State to control and regulate the public showing of films in effect automatically ousted the city of Lynchburg of any like power it may have had under its charter.

If municipalities may censor films and determine the right of the owners to exhibit them, then the unified control plan as outlined in the State statutes would be ineffectual and inoperative to carry out the expressed intention of the legislature.

Counsel for the city argue that inasmuch as the legislature in section 378h did not relieve State and local police officers from the duty "otherwise imposed of directing and prosecuting violations of the laws of the State of Virginia," this provision negatives any intent on the part of the legislature to exclude municipalities from determining for themselves whether a film is obscene and indecent. With this argument we are unable to agree. The reasonable construction of that provision is that local and State police officers may enforce the mandatory provisions of the State

statutes and if they detect any violations of the laws of the State whether they be violations of the statutes concerning the control of the exhibition of moving picture films or any other statutes they shall prosecute the violators. If the officers observe any improper conduct in moving picture theatres or any failure on the part of the operators of theatres to obey the laws regarding public safety or health, they are required to prosecute such offenders.

The decree is affirmed.

*Affirmed.*